Case 2:16-mj-00504 Document 2 Filed 12/09/16 Page 1 of 9 PageID# 2

FILED
DEC -9 2016
CLERK, U S DIST CT COURT
NORFOLK, VA

2:16MJ504

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Task Force Officer Richard Stocks, of the United States Department of Justice, Drug Enforcement Administration, being duly sworn depose and state the following:

### Experience and Training

1. I am an investigative or law enforcement officer of the United States of America within the meaning of Section 2510(7) of Title 18, United States Code (USC), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I have been employed as a Norfolk Police Officer since September 2002. I have been assigned to the Norfolk Police Department's Vice and Narcotics Division since February of 2007. From September of 2010 to May of 2015, I was assigned as a Task Force Officer to the FBI office in Norfolk. I am currently assigned as a Task Force Officer to the DEA High Intensity Drug Trafficking Area (HIDTA) task force in Norfolk. While assigned to the Norfolk Police Department Recruit Academy, I received eight hours of entry level law enforcement training regarding packaging, characteristics and manner of distribution of illegal narcotics. While assigned to the Second Patrol Division and Bicycle Patrol, I affected numerous arrests regarding narcotics violations, and became familiar with the packaging, characteristics and manner of distribution of illegal street level narcotics. I was also involved in numerous surveillance operations regarding the buying and selling of narcotics, and I was responsible for authoring and executing numerous search warrants during that time. I have attended narcotics and interdiction training programs and also participated in the Top Gun School put on by the Commonwealth Attorney's Council. I have also obtained a Title 18 Special Deputation of Justice through the United States Marshals Service.

3. I am familiar with the facts and circumstances of this investigation as a result of information received by me and summarized in reports I have reviewed. I have compiled information derived from discussions with experienced law enforcement officers. This affidavit contains a probable cause statement to support the issuance of an arrest warrant for the violation alleged and does not contain all the information known to me regarding the defendant. Based upon my experience and training, this affidavit is being made in support of a criminal complaint charging ANTONIO JACKSON with conspiracy to distribute and possess with intent to distribute five (5) kilograms or more of cocaine and a quantity of fentanyl, in violation of Title 21, United States Code, Sections 846, 841(a)(1), (b)(1)(B)(i), and (b)(1)(C).

## Background

4. On December 23, 2015, DEA agents from Hagerstown, Maryland notified Norfolk DEA of a probable heroin transaction that was set to occur in Chesapeake, Virginia. Norfolk DEA agents then notified the Chesapeake Police Department who assisted with an interdiction traffic stop of unindicted co-conspirator #1 (hereinafter "UCC-1"). During the traffic stop, police seized $275,221 in United States currency from UCC-1's vehicle along with several cell phones. Analysis of those cell phones led to the identification of additional co-conspirators in this investigation.

5. Through subsequent interviews and cell phone analysis, agents determined that UCC-1 distributed kilogram-quantities of cocaine and heroin, and specifically, supplied two high-level drug distributors in the Tidewater, Virginia area. One of those distributors was identified as ANTONIO JACKSON and the other is identified later herein as Confidential Source #4 (hereinafter "CS-4").

## Confidential Source #1

6. In June of 2016, DEA agents received information from Cooperating Source #1 (hereinafter "CS-1") who provided historical drug information about ANTONIO JACKSON. CS-1 was shown an array of photos that included ANTONIO JACKSON, and selected JACKSON's photo as the person he knew to be involved in distributing cocaine. CS-1 met JACKSON through another individual who was involved in

distributing large amounts of cocaine.

7. In October of 2012, CS-1 brokered a deal for one kilogram of cocaine between one of his suppliers and ANTONIO JACKSON for $46,000 at the Food Lion on Holland Road in Suffolk. CS-1 called his supplier who agreed to sell the cocaine to CS-1 for $44,000. CS-1 charged ANTONIO JACKSON $46,000 for the same kilo, paying himself and another individual $1,000 each for arranging the transaction. Two additional deals were arranged in the same manner in November and December of 2012, at a Food Lion on Greenwood Drive in Portsmouth, at a Wawa on Northampton Boulevard in Virginia Beach.

8. In July of 2013, ANTONIO JACKSON called CS-1 to ask about purchasing a kilo of cocaine. CS-1 made a few calls, and was able to locate a supplier who could do this. CS-1 then called JACKSON back, told him the price was $46,500, and they arranged to meet at a 7-11 on Victory Boulevard in Portsmouth. Once they arrived, JACKSON gave CS-1 $46,500 in cash and CS-1 went to a nearby Captain D's restaurant to meet the supplier who sold CS-1 the kilo for $46,000. CS-1 then returned to ANTONIO JACKSON at the 7-11 and sold him the kilo for $46,500, making $500 on the transaction.

9. In September of 2013, CS-1 found a new source of supply with better quality cocaine. From approximately September of 2013 to December of 2013, ANTONIO JACKSON purchased 1 kilogram of cocaine from CS-1 approximately once a week for $46,500.

10. In the beginning of 2014, CS-1 slowed down on selling cocaine, and instead, began to purchase small amounts of cocaine from ANTONIO JACKSON. During this time period, JACKSON told CS-1 that JACKSON's cocaine was coming from Florida to Virginia by tractor-trailer, and that he would meet the truck at Charlie's Truck Stop on Northampton Boulevard in Virginia Beach to retrieve the cocaine.

11. From approximately September to July of 2014, CS-1 purchased approximately 14 grams of cocaine every week from ANTONIO JACKSON. During one of these cocaine purchases in September of 2014, JACKSON showed CS-1 a small amount of heroin. JACKSON told CS-1 that there was more money to be made selling heroin because a person could put more cutting agent on heroin than cocaine. CS-1

3

*BV*
*RAS*

asked JACKSON to show him a larger amount of heroin, and JACKSON agreed, telling CS-1 to meet him at a Subway restaurant on Newtown Road in Virginia Beach. Later when they met, JACKSON pulled up to the Subway riding a bicycle. JACKSON got into CS-1's vehicle, and showed CS-1 nine ounces of heroin. During my investigation into ANTONIO JACKSON, I learned that one of his previous addresses was a residence in the 5400 block of Port Royal Drive, just a few blocks away from the Subway on Newtown Road in Virginia Beach.

### Confidential Source #2

12. In July of 2016, Confidential Source #2 (hereinafter "CS-2") was interviewed by DEA and advised that Antonio JACKSON was a local supplier of heroin and cocaine. On July 29, 2016, using CS-2, DEA and Norfolk police arranged to collect a free sample of suspected heroin from ANTONIO JACKSON. JACKSON had previously offered to provide CS-2 with a free sample of heroin to see if CS-2's customers liked the quality of the heroin, and to encourage CS-2 to purchase larger amounts of heroin from him. JACKSON and CS-2 agreed to meet at a shopping center in Virginia Beach. Investigators met CS-2 at a pre-determined neutral staging location, and searched both his/her person and vehicle for contraband and/or unreported currency, with negative results. CS-2 was then equipped with digital recording/monitoring devices, which were activated prior to departing the neutral staging location. Investigators briefed CS-2 as to safety concerns regarding the operation, and directed him/her to go straight to the meeting spot in Virginia Beach. Surveillance followed CS-2 to this location, maintaining a visual on him/her. Once CS-2 arrived, surveillance observed ANTONIO JACKSON get inside CS-2's vehicle and stay for a few seconds before getting out and going inside a nearby business. Surveillance maintained a visual on CS-2 throughout the duration of the transaction. While traveling back to the neutral staging location, CS-2 made no stops and had no contact with any other individuals. Once CS-2 arrived back at the neutral staging location, the digital recording devices were deactivated and he/she turned over the sample of suspected heroin to DEA agents. CS-2's vehicle and person were once again searched, locating no contraband or

unreported cash. The suspected heroin was properly packaged and vouchered and sent to the DEA Mid-Atlantic Laboratory for analysis which came back as .41 grams of fentanyl.

13. On August 1, 2016, investigators used CS-2 to set up a controlled purchase of one ounce of heroin from ANTONIO JACKSON for $2,400 at a shopping center in Virginia Beach. Agents met with CS-2 at a pre-determined staging location, where the CS-2's vehicle and person were searched for contraband and/or unreported currency, with negative results. CS-2 was then equipped with digital recording/monitoring devices, and given $2,400 of DEA official funds to complete the transaction. CS-2 was briefed as to safety concerns regarding this operation, and was directed to go straight to the proposed meeting spot. Surveillance followed CS-2 to this location, maintaining a visual on him/her. Once CS-2 arrived, surveillance observed ANTONIO JACKSON pull up to the location in the front passenger seat of a white Chevy SUV. CS-2 then walked over to JACKSON, and made the exchange through the passenger window. After the exchange, Antonio JACKSON left the area. Surveillance maintained a visual on CS-2 throughout the duration of the controlled purchase. While traveling back to the neutral staging location, CS-2 made no stops and had no contact with any other individuals. Once CS-2 arrived, the digital recording devices were deactivated and he/she turned over a plastic bag containing suspected heroin. CS-2's vehicle and person were once again searched, locating no contraband or unreported cash. The suspected heroin was properly packaged and vouchered and sent to the DEA Mid-Atlantic Laboratory for analysis which came back as 28.27 grams of fentanyl.

14. On August 10, 2016, investigators used CS-2 to set up a controlled purchase of 1 ounce of heroin from ANTONIO JACKSON for $2,400 at a shopping center in Virginia Beach. Agents met with CS-2 at a pre-determined staging location, where the CS-2's vehicle and person were searched for contraband and/or unreported currency, with negative results. CS-2 was then equipped with digital recording/monitoring devices, and given $2,400 of DEA official funds to complete the transaction. CS-2 was briefed as to safety concerns regarding this operation, and was directed to go straight to the proposed meeting spot.

Surveillance followed CS-2 to this location, maintaining a visual on him/her. Once CS-2 arrived, surveillance observed Antonio JACKSON get into the front passenger's seat of the CS-2's vehicle. A few minutes later, JACKSON got out of CS-2's vehicle, got into the same white SUV used in the previous controlled purchase, and left the area. Surveillance maintained a visual on CS-2 throughout the duration of the controlled purchase. While traveling back to the neutral staging location, CS-2 made no stops and had no contact with any other individuals. Once CS-2 arrived, the digital recording devices were deactivated and he/she turned over a plastic bag containing suspected heroin. CS-2's vehicle and person were once again searched, locating no contraband or unreported cash. The suspected heroin was properly packaged and vouchered and sent to the DEA Mid-Atlantic Laboratory for analysis which came back as 27.69 grams of fentanyl.

15. On October 27, 2016, DEA/NRO members used CS-2 to set up a controlled purchase of 2 ounces of cocaine for $2,700 from ANTONIO JACKSON on a side road off of Campostella Road in Norfolk. Agents met with CS-2 at a pre-determined staging location, where the CS-2's vehicle and person were searched for contraband and/or unreported currency, with negative results. CS-2 was then equipped with digital recording/monitoring devices, and given $2,700 of DEA official funds to complete the transaction. CS-2 was briefed as to safety concerns regarding this operation, and was directed to go straight to the proposed meeting spot. Surveillance followed CS-2 to this location, maintaining a visual on him/her. Once CS-2 arrived, surveillance observed ANTONIO JACKSON get out of the front passenger seat of a green Saturn parked nearby and get into CS-2's vehicle. JACKSON stayed for a few minutes, then got back into the green Saturn, and left the area. Surveillance maintained a visual on CS-2 throughout the duration of the controlled purchase. While traveling back to the neutral staging location, CS-2 made no stops and had no contact with any other individuals. Once CS-2 arrived, the digital recording devices were deactivated and he/she turned over a plastic bag containing the suspected cocaine. CS-2 also returned to investigators $100 of the official buy money because he/she stated JACKSON only charged him/her $2,600 for the

cocaine. CS-2's vehicle and person were once again searched, locating no contraband or unreported cash. Agents conducted a field test of the suspected narcotics yielding a positive result for cocaine. The suspected cocaine was properly packaged and vouchered and sent to the DEA Mid-Atlantic Laboratory for analysis which is currently pending.

### Confidential Source #3

16. During the investigation into ANTONIO JACKSON's drug trafficking activities, investigators learned that JACKSON was a possible narcotics source of supply for Confidential Source #3 (hereinafter "CS-3"). In the summer of 2016, investigators made several controlled purchases of cocaine and heroin from CS-3 and later approached him/her about cooperating with law enforcement. CS-3 agreed to cooperate, and was interviewed in late September of 2016. CS-3 identified ANTONIO JACKSON's photo and confirmed that his phone number was (757) ***-1766.

17. CS-3 stated that he/she had been getting small amounts of cocaine from Antonio JACKSON for a "long time." However, between August and September of 2015, CS-3 began purchasing approximately 1 ounce of heroin per week for $2,400 and also 1 ounce of cocaine per week for $1,350 from JACKSON. CS-3 would occasionally purchase larger amounts of cocaine from JACKSON during this time frame if a customer requested it.

### Confidential Source #4

18. In April of 2016, agents interviewed Confidential Source #4 (hereinafter "CS-4") who had direct knowledge of UCC-1's drug trafficking activities in Virginia from 2105 into early 2016. During the interview, CS-4 admitted that UCC-1 had supplied him/her with large quantities of cocaine charging $38,000 to $40,000 per kilogram. CS-4 also stated that he/she introduced ANTONIO JACKSON to UCC-1 and brokered several kilogram cocaine transactions between UCC-1 and JACKSON.

19. In October of 2016, agents conducted a follow-up interview with CS-4 who gave additional information about ANTONIO JACKSON. CS-4 met ANTONIO JACKSON through JACKSON's brother, and

RAS

previously brokered several cocaine transactions between ANTONIO JACKSON and UCC-1. Specifically, CS-4 recalled meeting JACKSON and UCC-1 at the Walmart, 4821 East Virginia Beach Boulevard in Virginia Beach where he/she brokered the sale of 1 kilogram of cocaine between them.

20. CS-4 also stated that UCC-1 would enlist female acquaintances to transport cocaine from New York to Virginia, including unindicted co-conspirator #2 (hereinafter "UCC-2"), who delivered 2 kilograms of cocaine on behalf of UCC-1 to CS-4 that was intended for ANTONIO JACKSON. On that occasion, CS-4 met UCC-2 and ANTONIO JACKSON at the Ramada Hotel, 515 North Military Highway in Norfolk, where CS-4 oversaw the 2-kilogram transaction. CS-4 remembered brokering two additional deals between UCC-1 and ANTONIO JACKSON, each for one kilogram of cocaine. The first occurred at the same Ramada Inn noted above, and the second occurred at a Comfort Inn at 347 Effingham Street in Portsmouth. On each occasion, JACKSON would pay UCC-1 directly for the cocaine. CS-4 stated that eventually, ANTONIO JACKSON and UCC-1 began to deal with each other directly thus eliminating him/her from future drug transactions.

21. On December 8, 2016, Norfolk and Virginia Beach police executed a search warrant at ANTONIO JACKSON's residence in the 600 block of Rivers Reach in Virginia Beach. Pursuant to the search warrant, investigators recovered approximately 300 grams of suspected cocaine, a .40 caliber Glock semi-automatic pistol, narcotics packaging material, two digital scales, paperwork bearing the name of ANTONIO JACKSON, and a large sum of United States currency. JACKSON was taken into custody, and read his Miranda Rights. He waived his rights, and agreed to speak with investigators. During their conversation, JACKSON stated, among other things, that the narcotics and other items referenced above belonged to him.

22. Based on the above facts, I believe probable cause exists to charge ANTONIO JACKSON with conspiracy to distribute and possess with the intent to distribute five (5) kilograms or more of cocaine and a quantity of fentanyl, Schedule II and Schedule I narcotic controlled substances respectively, in violation of

Title 21, United States Code, Sections 846, 841(a)(1), (b)(1)(B)(i) and (b)(1)(C), and ask that a warrant be issued for his arrest.

Further, your affiant sayeth naught.

Task Force Officer Richard Stocks
Drug Enforcement Administration

READ AND REVIEWED:

Sherrie S. Capotosto
Assistant United States Attorney

Sworn and subscribed to before me this ___9___ day of December, 2016

UNITED STATES MAGISTRATE JUDGE

At Norfolk, Virginia.

9